UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO: 5:10-CV-340-BR

| | |
|---|---|
| IN RE ) | |
| ) | |
| CRAIG L. ADAMS and ) | ORDER |
| MONICA L. ADAMS ) | |
| ) | |

Before this court is an appeal by creditor-appellant Ocwen Loan Servicing, LLC ("Ocwen") from the 7 July 2010 order of United States Bankruptcy Judge Stephani Humrickhouse. In that order, Judge Humrickhouse found Ocwen in contempt of the discharge injunction and the bankruptcy court's 23 May 2008 order. For the reasons set forth below, the bankruptcy court's decision is affirmed.

I. BACKGROUND[1]

On 26 October 2004, debtors filed a chapter 13 petition. (DE #2-1.) By order dated 25 April 2008, the bankruptcy court granted debtors discharge. (DE #3-2.) On 29 April 2008, debtors filed a motion for a declaration that they were current on their residential mortgage payments to Ocwen, their mortgage servicer. (DE #3-1.) Ocwen did not respond to the motion. On 23 May 2008, the bankruptcy court issued an order declaring debtors' indebtedness to Ocwen current and providing that any attempt to collect the "discharged principal payments, interest, fees or expenses . . . shall be deemed to be a willful violation of the discharge injunction and contempt of the orders of this Court; and that such action shall give the right to the Debtors to pursue a proceeding before this Court for contempt and appropriate sanctions." (DE #1-1.)

---

[1] The facts are taken primarily from the bankruptcy court's 7 July 2010 order. Where appropriate, the court cites to the record on appeal, by docket entry ("DE #___").

In the summer of 2008, debtors sought to refinance their mortgage, but were turned down after Ocwen transmitted an inaccurate payoff statement and loan history to the proposed new lender. Ocwen's documents reported that the loan on debtors' residence was in foreclosure, even though the loan has never been in foreclosure. Debtors, individually and through their attorney, repeatedly notified Ocwen of this error, but Ocwen failed to rectify its mistake. Debtors filed motions to reopen their bankruptcy case and to show cause why Ocwen should not be held in contempt on 12 September 2008. (DE #3-5, 3-6.) The bankruptcy court allowed the motion to reopen. (DE #3-7.) Ocwen subsequently filed a brief response to the show cause motion, requesting that the "matter be set for hearing while it investigates the claims made by the Debtors." (DE #4-1.) The bankruptcy court set the matter for hearing in November 2008; however, the hearing was continued a number of times on the parties' representations that they were attempting to resolve the matter without court intervention. (See DE ##4-3 to 4-13.) The bankruptcy court ultimately held the show cause hearing in May 2010. At the hearing's conclusion, the court found Ocwen in contempt of the discharge injunction[2] and its 23 May 2008 order and took the issue of damages under advisement. (DE #1-2.)

On 7 July 2010, the bankruptcy court issued a written order memorializing its finding Ocwen in contempt and assessing compensatory damages in the amount of $2500, plus attorneys' fees of $2250. (Id.) The court lowered the mortgage's interest rate to 6%, which it determined was a reasonable market rate for the period after the 23 May 2008 order. (Id.) Applying the modified interest rate, the court set the balance owing on the mortgage as of 1 July

---

[2]A discharge in bankruptcy "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such [discharged] debt as a personal liability of the debtor, whether or not discharge of such debt is waived." 11 U.S.C. § 524(a)(2).

2

2010 at $65,373.12. (Id.) Additionally, the court imposed punitive damages in the amount of $66,300, representing $100 per day from 12 September 2008, the date on which Ocwen was served with debtors' motion to show cause, until the date of entry of the contempt order. (Id.)

## II. DISCUSSION

The court reviews the bankruptcy court's findings of fact for clear error and its legal conclusions *de novo*. See In re Meredith, 527 F.3d 372, 375 (4th Cir. 2008). A court reviewing an order of civil contempt applies the abuse of discretion standard. JTH Tax, Inc. v. H & R Block Eastern Tax Servcs., Inc., 359 F.3d 699, 705 (4th Cir. 2004).

Ocwen contends that Judge Humrickhouse erred in a number of respects. It argues that (1) the bankruptcy court lacked the authority to modify the terms of debtors' residential mortgage; (2) the bankruptcy court lacked the authority to order a contempt sanction for violations of the discharge injunction; (3) the punitive damages award constitutes an impermissible criminal contempt sanction; and (4) the amount of the punitive damages award is constitutionally excessive. (Appellant's Br. at 2-4.) The court addresses these arguments in turn.  A.  Residential Loan Modification Exception

Ocwen first contends that the bankruptcy court is prohibited from modifying terms of debtors' mortgage pursuant to 11 U.S.C. § 1322(b)(2). Under that statute, "[a] debtor's Chapter 13 plan may 'modify the rights of holders of secured claims, *other than a claim secured only by a security interest in real property that is the debtor's principal residence*.'" In re Ennis, 558 F.3d 343, 345 (4th Cir. 2009) (quoting 11 U.S.C. § 1322(b)(2)) (emphasis added). The statute's mortgage anti-modification clause was enacted "to encourage the flow of capital into the home lending market." Nobelman v. American Sav. Bank, 508 U.S. 324, 332 (1993) (Stevens, J.,

3

concurring).

In examining what constitutes impermissible modification of a residential mortgage under § 1322(b)(2), the Fourth Circuit explains:

> The bankruptcy courts have consistently interpreted the no-modification provision of § 1322(b)(2) to prohibit any fundamental alteration in a debtor's obligations, e.g., lowering monthly payments, converting a variable interest rate to a fixed interest rate, or extending the repayment term of a note. *See, e.g., In re Schum*, 112 B.R. 159, 161-62 (Bankr. N.D. Tex. 1990) (concluding that plan was impermissible modification because it proposed to reduce monthly payments and secured valuation). In *In re Gwinn*, 34 B.R. 936, 944-45 (Bankr. S.D. Ohio 1983), the court approved a plan as a permissible cure under § 1322(b)(5), because the plan did not propose to lower monthly payments, extend the repayment period, or make the obligation conditional. It instead sought only to reinstate the original contract with a minor delay in payment. *Id.; see also In re Cooper*, 98 B.R. 294 (Bankr. W.D. Mich. 1989) (finding impermissible modification where plan proposed new payment schedule). Along similar lines, another bankruptcy court concluded that confirmation of a Chapter 13 plan would have constituted an impermissible modification because the plan proposed to alter fundamental aspects of the debtor's obligations, i.e., the nature and rate of interest, and the maturity features of the loan. *In re Coffey*, 52 B.R. 54, 55 (Bankr. D.N.H. 1985). As these decisions have emphasized, § 1322(b)(2) prohibits modifications that would alter at least one fundamental aspect of a claim.

In re Litton, 330 F.3d 636, 643-44 (4th Cir. 2003).

Significant here is § 1322(b)(2)'s prohibition against a *plan* that modifies a fundamental aspect of a residential mortgage creditor's secured claim. The bankruptcy court confirmed debtors' Chapter 13 plan on 14 March 2005. (DE #2-3.) No one contends that the confirmed plan modified debtors' obligations to Ocwen. As such, no violation of § 1322(b)(2) has occurred.

Ocwen's argument suggests that the bankruptcy court can never modify a debtor's

4

residential mortgage, even where the creditor has violated the Bankruptcy Code or a court order, to the detriment of a debtor. Such a result is contrary to the plain language of § 1322(b)(2) and the "fresh start" that the Bankruptcy Code envisions a debtor receives upon emerging from bankruptcy. In analyzing whether § 1322(b)(2) forecloses a Chapter 13 debtors' claim against the mortgage lender for allegedly attempting to collect fees and costs post-discharge, another bankruptcy court's observations are particularly instructive:

> Essentially, [the mortgage lender] reads too much into § 1322(b)(2). Section 1322(b)(2) prevents a chapter 13 plan from modifying a mortgage lender's contract rights. A chapter 13 debtor may not modify principal or interest payments or discharge fees and expenses allowed by the mortgage contract. But § 1322(b)(2)'s protections do not place mortgage lenders outside the court's purview.
> Section 1322(b)(2) prevents a plan from modifying a mortgage lender's substantive contract rights, but § 1322(b)(2) does not allow a mortgage lender to ignore the procedural limits imposed by the Bankruptcy Code and Rules that govern how those rights are exercised. A mortgage lender must exercise its contract rights in the manner allowed by the Bankruptcy Code, Bankruptcy Rules, and court orders. Bankruptcy Rule 2016 requires mortgage lenders to disclose any fees and costs the mortgage lender intends to collect from the debtor. Enforcement of Rule 2016 is necessary to enforce the rights and obligations imposed by specific Code provisions. Failure to enforce Bankruptcy Code and Rule requirements would allow mortgage lenders to deny debtors the promised fresh start, despite their diligent compliance with all that the Code and the court asked of them.

In re Cano, 410 B.R. 506, 521 (Bankr. S.D. Tex. 2009).

Here, the bankruptcy court's modifications of the subject mortgage constitute contempt sanctions, assessed independently of debtors' plan. The court modified the mortgage as a result of Ocwen's violation of the discharge injunction and the court's order and to thereby compensate debtors for losses incurred. A modification of a residential mortgage under these circumstances

is not subject to any limitations imposed by § 1322(b)(2).[3]

B.  Sanctions Under Section 105

Ocwen next argues that the bankruptcy court did not have the authority under 11 U.S.C. § 105 to impose sanctions under the circumstances here.  This statute empowers the bankruptcy court to hold parties in civil contempt for violating the Bankruptcy Code as well as its orders.  See 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."); In re Walters, 868 F.2d 665, 669 (4th Cir. 1989).  While recognizing that the bankruptcy court possesses such authority, Ocwen contends a predicate violation of neither the Bankruptcy Code nor a court order occurred here.  (Appellant's Br. at 2-3, 10-11.)  Specifically, Ocwen claims that its "mere delay" in updating its accounts to reflect the discharge does not constitute an act to collect, recover or offset a discharged debt in violation of the discharge injunction nor an attempt to collect the discharged principal payments, interest, fees, or expenses in violation of the court's 23 May 2008 order.

Ocwen points to many cases which recognize that a creditor's reporting of inaccurate credit information about the debtor, without evidence of intent to coerce payment of the discharged debt, does not violate the discharge injunction.  Another bankruptcy court summarizes the law in this regard.

---

[3] In a footnote, Ocwen asserts that there is no factual basis for the bankruptcy court's determination that 6% is a reasonable market rate debtors could have obtained had they refinanced in 2008. (Appellant's Br. at 9 n.4.)  At the hearing on the motion to show cause, as possible sanctions against Ocwen, debtors' counsel suggested a modified interest rate on the subject mortgage of 6% through 2008, of 5.5% for the first six months in 2009, and 5% thereafter. (DE #11 at 13.)  When the court subsequently questioned Ocwen's counsel about this "creative solution," Ocwen's counsel pointed out that 5% is below the current market rate. (Id. at 24.)  She acknowledged "six percent through 2008 is most probably accurate.  As is the 5.5 percent for 2009." (Id. at 25.)  She stated the current market rate, for creditors with "pristine credit," is "right around 5.45 to 5.5 percent." (Id.)  The bankruptcy court's determination that 6% was an appropriate interest rate by which to sanction Ocwen was not an abuse of discretion (or clearly erroneous, if one characterizes the determination of the interest rate a finding of fact).

6

> [C]ourts have frequently held that acts which by their nature
> constitute efforts to collect discharged debts– such as filing suit
> against the debtor, sending dunning notices, or attaching the
> debtor's property– are not excused simply because they were
> mistakenly pursued.  However, a distinction must be made
> between acts which have as their direct and natural purpose the
> collection of debts and acts which have some other lawful purpose
> but could also be used (or, more accurately, misused) to coerce
> payment of a debt.  The reporting of a delinquent debt to a credit
> reporting agency is not inherently an act to collect a debt but rather
> to share information relevant to credit granting decisions.  A
> creditor reports both performing and delinquent accounts in the
> expectation that other credit grantors will do the same, enhancing
> each creditor's ability to evaluate proposed credit transactions and
> to avoid extending credit or making loans to poor credit risks.
>       This is not to say that the reporting of a discharged debt as
> delinquent rather than discharged would not, at least in some
> circumstances, place pressure on a debtor to pay the debt.  And the
> court does not doubt that there are at least some creditors who
> report discharged debts without an indication of their bankruptcy
> status in the hope that debtors will be pressured into paying them
> as a condition of obtaining future credit.  But where the action
> complained of does not on its face constitute an act to collect a
> debt, the burden is on the debtor to show that the creditor took the
> challenged action for the specific purpose of collecting a
> discharged debt.
> . . . .
>       Of course there will be circumstances in which an improper
> motive may be inferred, thereby shifting the burden to the creditor
> of showing otherwise.  For example, if a creditor, having been
> informed of the problem, inexplicably fails to take corrective
> action, a debt collection motive may be inferred (particularly
> where the creditor fails to respond to the motion to reopen alleging
> such a motive).  In those circumstances, reopening the case to
> award injunctive relief and attorneys fees might well be
> appropriate, even in the absence of other provable damages. . . .

In re Jones, 367 B.R. 564, 569-70 (Bankr. E.D. Va. 2007) (citations and footnote omitted).

This case falls within that latter situation the Jones court identifies.  The evidence shows Ocwen did more than delay updating its accounts.  It transmitted an inaccurate payoff quote and loan history to debtors' potential mortgagee; assessed discharged principal, fees, and costs;

7

reported inaccurate information to credit reporting agencies; and, most importantly, after the inaccurate information had been brought to its attention a number of times, failed to correct the information, at least as of the date of the bankruptcy court's hearing.  Ocwen never presented any evidence to the contrary.  The court agrees with the bankruptcy court that Ocwen willfully violated the discharge injunction and the bankruptcy court's 23 May 2008 order.  As such, the bankruptcy court had the authority pursuant to 11 U.S.C. § 105 to sanction Ocwen for these violations.

C. <u>Punitive Damages</u>

Ocwen next argues that even if the bankruptcy court had the authority to hold it in civil contempt under § 105, the punitive damages award constitutes an impermissible criminal contempt sanction.[4]  Ocwen correctly recognizes that how a court labels a contempt sanction is not dispositive.  Rather,

> the critical features for determining whether a contempt remedy is civil or criminal are the substance of the proceeding and the character of the relief that the proceeding will afford.  When the nature of the relief and the purpose for which the contempt sanction is imposed is remedial and intended to coerce the contemnor into compliance with court orders or to compensate the complainant for losses sustained, the contempt is civil; if, on the other hand, the relief seeks to vindicate the authority of the court by punishing the contemnor and deterring future litigants' misconduct, the contempt is criminal.  For these reasons, putatively civil contempt sanctions will be held to be criminal sanctions in cases when the fines were not conditioned on compliance with a court order, not tailored to compensate the complaining party, but instead initiated to vindicate the authority of the court and to punish the actions of the alleged contemnor.

---

[4] Notably, Ocwen does not argue that its conduct does not meet the standard the bankruptcy court applied to assess punitive damages, i.e., "'egregious conduct,' 'malevolent intent,' or 'clear disregard of the bankruptcy laws,'" (DE #1-2 at 11).

Cromer v. Kraft Foods N. Am., Inc., 390 F.3d 812, 821-22 (4th Cir. 2004) (citations, alteration, and quotations omitted). If the contempt sanction is in fact criminal, certain due process protections must be provided and procedures followed prior to its imposition. See id. at 820.

     A number of courts recognize that punitive damages may be awarded as a contempt sanction under § 105 for violation of the discharge injunction. See, e.g., In re Workman, 392 B.R. 189, 195, 196 (Bankr. D.S.C. 2007) (awarding plaintiffs/debtors punitive damages of $100 per day, from time mortgagee sent plaintiffs/debtors letter inaccurately notifying them they were past due on mortgage and responsible for fees through entry of contempt order, for violating confirmation and discharge orders as "appropriate to coerce compliance with the orders" ); In re Mooney, 340 B.R. 351, 361-62 (Bankr. E.D. Tx. 2006) (finding a punitive damages award of $40,000 for violation of the discharge injunction as "'necessary and appropriate to carry out the provisions of the Bankruptcy Code'" where creditor continued with its course of conduct even after having been informed of its violations of the discharge injunction); In re Cherry, 247 B.R. 176, 187, 189-90 (Bankr. E.D. Va. 2000) (although ultimately concluding punitive damages were not warranted, recognizing most courts allow punitive damages for violation of the discharge injunction). But see In re Dyer, 322 F.3d 1178, 1195 (9th Cir. 2003) ("[W]hen a bankruptcy court exercises the contempt authority of § 105(a), it may not impose serious punitive sanctions.").

     The imposition of punitive damages as a contempt sanction does not necessarily constitute a criminal contempt sanction. As a bankruptcy court has noted,

> [t]he imposition of punitive damages under the authority granted under § 105 in this context does not carry this court into the realm of criminal contempt as contemplated by 18 U.S.C. § 401[, the criminal contempt statute,] and *Griffith v. Oles (In re Hipp)*, 895

9

> F.2d 1503, 1515 (5th Cir. 1990)[, where the Fifth Circuit held that
> bankruptcy courts do not have jurisdiction to try for criminal
> contempt]. Clearly every assessment of punitive damages does not
> occur within that forbidden realm. The assertion that all criminal
> contempt sanctions are punitive in nature does not render all
> punitive sanctions criminal in nature. This Court is not assessing
> these punitive sanctions for contempt of this Court's authority. It is
> assessing these sanctions, as requested by the debtor, for the
> violation of the statutory protections provided to her under § 524
> and to which she is entitled as the *quid pro quo* for properly
> disclosing and surrendering all of her non-exempt property to the
> trustee for the benefit of her creditors. The vindication of these
> statutory protections is critical to the proper restructuring of the
> debtor-creditor relationship and is an integral part of the
> bankruptcy case, not separate and independent from it. Issuing
> reasonable sanctions of this type under the proper circumstances is
> clearly "necessary and appropriate" to insure that the bankruptcy
> system actually works. Although language utilized in some
> jurisprudence has unfortunately blurred the lines in this area, [the
> creditor] committed no crime here, nor is it being punished for one.

Mooney, 340 B.R. at 362 n.29.

In this case, the court finds that the bankruptcy court's $66,300 punitive sanction was a proper civil contempt sanction. It is clear from the record that the bankruptcy court was most concerned about Ocwen's failure to correct its reports or the information it reports to credit reporting agencies, despite having been repeatedly notified of such failure and in the face of the motion to show cause and hearing thereon. (See DE #1-2 at 7 (recognizing at the hearing that the court was presented with no evidence that Ocwen had taken any corrective action to date), 8 ("That Ocwen still *proposes* to correct its reporting, and has not *yet* given proof of having done so, is mind-boggling." (emphases in original)), 9 ("The fact that Ocwen is unwilling to acknowledge the seriousness of this matter even today carries significant weight with the court."); DE #11 at 54 ("I find most egregious here, although . . . violation of an order of this court is egregious in and of itself, is the continued reporting of this loan in the fashion, almost to

date. I find that most egregious and if I, in fact, do award punitive damages, it will be based in large part upon that.").) Specifically with reference to punitive damages, Judge Humrickhouse stated, "Ocwen has given every indication that it is and will remain indifferent to the statutory significance of the discharge injunction and to the express terms of the May 23, 2008 order, unless it is compelled to take note." (DE #1-2 at 11 (citing Cherry, 247 B.R. 176, 189-90).) These statements evidence the judge's belief that Ocwen would not take any action on its records without a punitive sanction being imposed. Thus, the punitive sanction was intended to coerce Ocwen into correcting its records and the information it was disseminating about debtors' accounts and thereby coercing Ocwen to comply with the discharge injunction and the court's 23 May 2008 order. Ultimately, an award of this type is necessary and appropriate to carry out the "fresh start" provisions of the Bankruptcy Code and is a proper civil contempt sanction under the facts here.

D. Constitutionality of Punitive Sanctions

Finally, Ocwen contends that the bankruptcy court's punitive damages award is unconstitutionally excessive. In evaluating the reasonableness of a punitive damage award, courts consider (1) the degree of reprehensibility of the wrongdoer's conduct; (2) the ratio of the punitive damages award to compensatory damages; and (3) punitive damage awards or sanctions for comparable misconduct. See BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 574-84 (1996). The court examines each of these in turn.

Evaluation of reprehensibility is based on five factors:

> (1) whether the harm done was physical as opposed to economic;
> (2) whether the conduct involved indifference to the health or safety of others; (3) whether the victim was financially vulnerable;
> (4) whether the conduct involved repeated actions or was isolated;

> and (5) whether the harm suffered by the plaintiff resulted from
> conduct that was known or suspected to be unlawful.

EEOC v. Federal Express Corp., 513 F.3d 360, 376-77 (4th Cir. 2008) (citing BMW, 517 U.S. at 576-77). Considering these factors, Ocwen's conduct was, indeed, reprehensible. Its gross misrepresentation of the status of debtors' mortgage debt was not an isolated incident. In fact, it continued over a period of many months, despite debtors' and their attorney's repeated requests that Ocwen rectify its error and their filing of a motion to show cause. Such persistent misconduct can only be characterized as willful and intentional. Furthermore, as previously recognized, debtors depended upon Ocwen's accurate reporting to take full advantage of the "fresh start" offered by the bankruptcy system. Ocwen's conduct is particularly worthy of punitive sanctions, given debtors' financial vulnerability. See BMW, 517 U.S. at 576 ("To be sure, infliction of economic injury, especially when done intentionally through affirmative acts of misconduct or when the target is financially vulnerable, can warrant substantial penalty." (citation omitted)).

Turning to the ratio of punitive damages to the compensatory award, Ocwen contends that the amount of the punitive award is impermissibly excessive because it represents a 14-to-1 ratio. It is true that awards exceeding a single-digit ratio will generally be deemed unconstitutionally excessive. See Exxon Shipping Co. v. Baker, 554 U.S. 471, 501 (2008) ("[W]e have determined that 'few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process'. . . ." (citation omitted)). However, Ocwen's argument fails to consider the previously-determined permissible loan balance modification in its ratio calculation. Including the value of loan balance modification, the ratio between the punitive and compensatory damages awards is, in fact, 4-to-

1, and falls squarely within the confines of due process.[5]

Finally, the punitive damages award is consistent with damage awards in comparable cases. See Workman, 392 B.R. at 196-97 ($100.00 per day for each day mortgagee violated the confirmation and discharge orders (relying on A.H Robins Co., Inc., 197 B.R. 561 (E.D. Va. 1994) (sanctioning an attorney $100.00 per day for each day that he was in violation of a confirmation order)).

In sum, the court finds that the punitive damages award does not exceed constitutional limitations.

### III.  CONCLUSION

The 7 July 2010 Order of the Bankruptcy Court of the Eastern District of North Carolina is AFFIRMED.

This 24 January 2011.

                                                                                       W. Earl Britt
                                                                                       Senior U.S. District Judge

---

[5] The value of the loan modification is the difference in the amount Ocwen claimed as the principal owing as of 23 May 2008 ($76,426.43) and the amount the bankruptcy court set as the balance remaining as of 1 July 2010 ($65,373.12).  (See DE #1-2 at 11.)   This calculation does not take into account the effect of the new 6% interest rate over the remaining life of the loan, which would presumably result in an even higher compensatory damage figure and thus a lower ratio of punitive damages to compensatory damages.